**SIGNED THIS: March 07, 2011**

                                                                                    _____
                                                                                    **MARY P. GORMAN**
                                                                                    **UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | In Bankruptcy |
| JOSEPH DEAN WALKER and | ) | |
| TERESE ANN WALKER, | ) | Case No. 10-72459 |
| | ) | |
| Debtors. | ) | |

# O P I N I O N

Before the Court is the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Lenders and (C) Scheduling a Final Hearing ("Cash Collateral Motion"). The Cash Collateral Motion seeks relief as to two creditors with secured interests in the Debtors' cash collateral, namely, Agstar Financial Services, PCA d/b/a ProPartners Financial ("ProPartners") and Cooperative Finance Association, Inc.("CFA"). An agreed order was

-1-

previously entered authorizing the interim use of cash collateral with respect to both ProPartners and CFA. An evidentiary hearing on the Debtors' request for a final order as to CFA was held on February 23, 2011.[1] For the reasons set forth herein, the Debtors' request to use the cash collateral of CFA to fund the expenses of growing their 2011 crops will be denied.

**Factual and Procedural Background**

Joseph Dean Walker and Terese Ann Walker ("Debtors") filed their voluntary petition under Chapter 12 of the Bankruptcy Code on August 6, 2010. The Debtors scheduled indebtedness to CFA in the approximate amount of $90,812 and acknowledged that CFA held a secured interest in the Debtors' 2010 growing crops, the proceeds of such crops, and other products, supplies, and accounts.

Debtors filed their Cash Collateral Motion on October 7, 2010. In the Cash Collateral Motion, they asserted that they were in the process of harvesting crops and needed to use approximately $90,000 of cash collateral to pay "immediate" expenses. Debtors

---

[1] After entry of the interim order, ProPartners has not actively participated in this case. It did not appear by counsel or any representative at the hearing on February 23, 2011. Because the evidence at the hearing established that the use of ProPartners' cash collateral will be secured not only by the 2011 crop but also by a pre-existing lien on equipment which has an appraised value in excess of the entire indebtedness of the Debtors to ProPartners, the Cash Collateral Motion will be granted as to ProPartners by a separate order.

represented that they had approximately $18,000 of hay on hand and expected to receive approximately $220,000 for their corn and soybean crops yet to be sold.  Debtors represented that both CFA and ProPartners had an interest in the cash collateral to be used, and alleged that both creditors would be adequately protected by a continuing lien on expected proceeds from crop sales.

The Cash Collateral Motion was initially scheduled for hearing on October 19, 2010.  At that time, the parties reported that they had reached an agreement on the interim use of cash collateral.  The parties' Agreed Order, which was entered on November 24, 2010, provided, *inter alia*, for the Debtors to use $93,960 of cash collateral and for CFA and ProPartners to have a continuing lien on 2010 crop proceeds and other assets.

The Cash Collateral Motion also requested that, on a final basis, the Debtors be authorized to use their remaining 2010 crop proceeds of at least $203,000 to fund the expenses of growing their 2011 crops.  The Debtors propose to give CFA a lien on the 2011 crop as adequate protection for this ongoing use of cash collateral.  CFA objects to this continued use of its cash collateral.  As set forth above, the final evidentiary hearing on the Cash Collateral Motion was held February 23, 2011.

At the hearing, Terese Walker testified that the Debtors had $14,487.93 in their personal checking account from hay sales and $46,942.02 in their business checking account from hay sales, corn

and soybean sales, and government payments. Mrs. Walker also testified that the Debtors had in their possession checks made payable to them and CFA jointly for sales of corn and soybeans in the amounts of $66,540.83, $4630.40, $36,723.29, and $54,180.69. The attorney for the Chapter 12 Trustee reported at the hearing that the Trustee is holding an additional $23,077.58 in crop sale proceeds.

Joseph Walker testified that he has farmed all of his life but that, several years ago, he was involved in an accident and sustained injuries that limited his ability to work. His health problems caused him to need to hire additional help, and the expenses associated with that help resulted in financial losses. He is now fully recovered and no longer has any hired help. Further, he has entered into an agreement with his brother and nephews to custom farm approximately 626 acres. He previously farmed the same acreage with the family members on a 50/50 basis which required him to contribute half of the up front costs for inputs in exchange for half of the profits. The new custom farming agreement requires the family members to provide all of the inputs and requires Joseph Walker to provide only the labor, equipment, and fuel to plant and harvest the crops in exchange for fixed per-acre payments.

The Debtors filed their First Amended Plan ("Plan") on February 15, 2011. Joseph Walker testified about the Plan and the

various exhibits attached to the Plan.  Those exhibits provide projections for farm income and expenses for 2010 through 2014 and disclose Debtors' cash flow projections to fund both Plan payments and operating expenses for the term of the Plan.  Mr. Walker testified that, based on his current projections, he would need approximately $197,673 to fund the expenses of his 2011 crop.  Mr. Walker also testified that, in addition to the funds which his wife testified were on hand, the Debtors also have approximately $10,000 in hay yet to sell.

James Walker, the brother of Joseph Walker, also testified. James Walker is an insurance agent and provided information about the Debtors' crop insurance which guarantees income if crop yields or prices fall below certain limits.  James Walker is also involved in the custom farming operation that Joseph Walker explained in his testimony.  James Walker testified as to the continued willingness of himself and his sons to assist the Debtors in their farming operations.

Bruce Mead, director of lending services, testified for CFA. Mr. Mead identified an exhibit which provided a calculation showing that, as of the hearing date, the Debtors were indebted to CFA in the total amount of $119,054.90 for principal, interest, and fees. Mr. Mead acknowledged that, after the exhibit had been prepared and tendered to Debtors' counsel pursuant to this Court's pretrial order, CFA received a payment from the Debtors in the amount of

$1517 which should be credited against the amount shown on the exhibit.

## Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. Resolving issues regarding the use of cash collateral and adequate protection are core proceedings. *See* 28 U.S.C. §157(b)(2)(A) & (M).

## Legal Analysis

"Cash collateral" includes cash, deposit accounts, and other cash equivalents. 11 U.S.C. §363(a). Debtors do not dispute that the funds they have on hand in their bank accounts and in the uncashed checks constitute the cash collateral of CFA. Accordingly, such cash collateral may only be used with the consent of the creditor or by authorization from this Court after a hearing at which the Debtors establish that the value of the property to be used is adequately protected. 11 U.S.C. §363(c)(2)&(3); 11 U.S.C. §1205.

Case law does not generally support finding that a lien on crops to be grown in the future constitutes adequate protection for the use of cash collateral in either Chapter 11 or Chapter 12 cases. See 3 *Collier on Bankruptcy* ¶361.03[3] (16th ed.); *In re Polzin*, 49 B.R. 370 (Bankr. D. Minn. 1985)(Chapter 11); *In re*

*Krumm*, 87 B.R. 76 (Bankr. D. Neb. 1988)(Chapter 12). Because cash collateral is consumed, or used up, the standard for determining adequate protection is strict. See *Polzin*, 49 B.R. at 371-72. The risks of farming are generally considered too great to establish that liens on crops not yet planted can provide adequate protection for the use or consumption of creditors' cash. See *Krumm*, 87 B.R. at 78. Courts that have allowed the use of cash collateral and found that such use is adequately protected by a lien on future crops have done so cautiously and only when the lien is first in priority and superior to all production and input provider liens. See, e.g., *In re Westcamp*, 78 B.R. 834, 837 (Bankr. S.D. Ohio 1987).

Terese Walker, Joseph Walker, and James Walker all testified credibly regarding their efforts to project income and control expenses for the Debtors' 2011 crop year. The Debtors' presentation at the hearing was well-organized and very thorough. The presentation included introduction of the Debtors' proposed First Amended Plan of Reorganization and cash flow projections attached to the Plan projecting the amounts needed in 2011 and future years to fund the Debtors' operations and to make Plan payments. Unfortunately for the Debtors, however, the numbers just do not add up to establish that the use of CFA's cash collateral will be adequately protected by a lien on future years' crops.

Attached to the Plan is Exhibit B which contains the cash flow

-7-

projections.  At page 2, Debtors' total 2010 income from all farming sources is projected to be $414,430.82.  Although the Debtors have not yet sold all of their hay, the projected income amount was generally supported by the testimony and appears to be very close to the actual gross income that will be recognized by the Debtors for last year's operations.  At page 7 of the same exhibit, the Debtors have provided a projection of "Income, Expenses & Payments From 2010 Crop."  That projection starts with the gross revenue of $414,430.82 and then subtracts out the $93,960 used for harvest expenses pursuant to the interim order and also subtracts out $197,673.96 for projected expenses for the 2011 crop.  Debtors then suggest that they will have $122,796.86 remaining and, from that, they propose to pay $52,138.58 in Plan payments on March 2011, $3755.30 in Chapter 12 Trustee fees in March 2011, and $75,139.60 for insurance and family living expenses throughout the year.  The Debtors acknowledge that these figures leave them $8236.62 short, but they have a commitment from James Walker to lend them that difference.

    The problem for the Debtors is, however, that their own figures leave them in a much worse position than they acknowledge.  The projections suggest that Debtors have both the $197,673.96 for 2011 crop expenses and the $122,796.86 for Plan payments and other expenses on hand from 2010 income.  But, the Debtors do not have the $320,470.82 total of those amounts on hand.  They only have the

funds in their accounts and the uncashed checks that Terese Walker testified about in the amount of $233,505.16, the funds on deposit with the Trustee in the amount of $23,077.58, and the $10,000 in unsold hay.  These assets total $256,582.74.  Thus, the Debtors have $63,888.08 less in cash funds to begin 2011 than their projections indicate.  The only possible way for them to continue to farm, make their Plan payments and continue to pay modest living expenses will be for them to spend their government payments and custom farming income during this year and to seek to sell early crops and use the cash from those crops to finish paying harvest expenses just as they did this past year.  Thus, the additional sources of income from the 2011 crops - custom farming and government payments - which they offer to pledge as adequate protection to CFA will most likely be substantially consumed during the year and not preserved to assure payment to CFA at the end of the year.

The Debtors' cash flow problems will be compounded in 2012 because Debtors propose to make significantly higher Plan payments in March 2012. Even if the Debtors finish right on budget for 2011, they will be significantly short on cash at the end of the year because they do not have enough 2010 cash to fund their operations, and they will have to spend 2011 revenue to complete their operations. Unfortunately, they have made their 2012 projections using the erroneous assumption that they will have all of the gross

proceeds from the 2011 crop available to fund 2012 crop expenses, Plan payments, and 2012 living expenses. But, based on the shortfall with their starting cash this year, it appears they will fall far short of having what will be needed at the beginning of 2012 to make Plan payments and fund their farming operations and household for another year.

Another problem with the Debtors' proposal is that they apparently do not intend to pay CFA in full at the end of 2011 for the use of its cash collateral. Instead, the Plan proposes to stretch out payments to CFA until 2013. Implicit in the proposal is the continued use of CFA's cash collateral without the necessity of filing motions seeking authority to do so in future years. It is unlikely that such a provision could be confirmed over the objection of CFA, and CFA clearly objects to it. Such a Plan provision may not meet the "lien retention" requirements for Chapter 12 plan confirmation. *See* 11 U.S.C. §1225(a)(5)(B); *In re Stallings*, 290 B.R. 777, 788 (Bankr. D. Idaho 2003).

Debtors argue that, because they will be obtaining crop insurance, CFA is guaranteed payment. That is not true. Crop insurance guarantees revenue in the event yields or prices fall below set minimums. Crop insurance does not guarantee profit. The Debtors' budget has no flexibility and, in 2011, even the Debtors' own predictions have them falling over $8000 short. Corn and soybean prices are currently high, but fuel prices are rising too.

-10-

Even without the cash flow problems discussed above, the use of CFA's cash collateral would not be adequately protected where there is no margin whatsoever in the Debtors' expenses for any increases in costs.

Debtors have also offered CFA a third position lien on vehicles and equipment as additional adequate protection. The parties have stipulated that the appraised value of all of the vehicles and equipment is $230,850. After deducting all prior liens, the remaining equity is stipulated by the parties to be $44,323.76. This Court agrees with CFA that a third lien on the vehicles and equipment would add little value to their position. If the assets depreciate by just 5% per year and the potential costs of sale are estimated at 10%, a forced sale of these assets at the end of 2011 or early 2012 would yield little for CFA.

For the reasons set forth herein, Debtors' Motion for entry of a final order authorizing the use of cash collateral and granting adequate protection to CFA must be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###